# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.

SUPERIOR COURT
CIVIL ACTION
NO.: 1883CV00173

COLIGNY REJOUIS, PPA DIONY REJOUIS,
MARSHA PHILEMOND, AND
DIONY REJOUIS,
                    Plaintiff,
V.
AMY KOGUT, CNM, AND
GOOD SAMARITAN MEDICAL CENTER,
                    Defendants.

## PLAINTIFFS' OFFER OF PROOF

In this medical malpractice action, the plaintiffs Coligny Rejouis, PPA Marsha Philemond, and Diony Rejouis seeks to recover for the severe and permanent personal injuries sustained as a result of the negligent and careless treatment rendered to Coligny Rejouis by defendants, Amy Kogut, CNM, and Good Samaritan Medical Center.

Specifically, the plaintiffs allege that the defendant, Amy Kogut, CNM, deviated from the accepted standard of care at the time for the average qualified certified nurse midwife. As a direct result of the CNM Kogut's deviations from the accepted standard of care, Coligny Rejouis suffered a severe and permanent neurological injury that resulted in the loss of use of his right arm. Had CNM Kogut rendered care within the accepted standard of care as outlined above, Coligny Rejouis would not suffer from the severe and permanent brachial plexus palsy (loss of use of his right arm) with which he lives today.

The written portion of the plaintiffs' Offer of Proof consists of the following items which will be offered at the trial of this action:

1

A. Good Samaritan Medical Center records, dated 9/21/15 through 9/24/15;

B. Brockton Neighborhood Health Center records, dated 9/28/15 through 10/2/15;

C. Boston Children's Hospital records, dated 10/12/15 through 4/11/16;

D. Expert Letter and Curriculum Vitae of Alexander Friedman, M.D.

This written portion of the plaintiffs' Offer of Proof also contains an argument that the plaintiffs have satisfied the requirements of M.G.L. c. 231 §60B in that this action presents a legitimate question of liability appropriate for further judicial review.

<h3 style="text-align:center">STATEMENT OF FACTS</h3>

Coligny Rejouis is an 11 month old baby boy who suffered a right brachial plexus injury (Erb's palsy) due to a traumatic birth that resulted in a flaccid right arm. **(A95, C2)** As of April 2016, Coligny has had no return of nerve function or use of the right arm. **(C14)** To a reasonable degree of medical certainty, Coligny's severe and permanent right arm injury is a direct result of the substandard care and treatment rendered to him by Amy Kogut, CNM.

In September 2015, Marsha Philemond, Coligny's mother, was a 33 year old G2, P1, expecting the birth of her second child with an EDC of 9/26/15. **(A2, A94)** Ms. Philemond was GBS positive and her pregnancy was complicated by gestational diabetes which was diet controlled. **(A2-3, A7)**

On 9/21/15, Ms. Philemond at 39 weeks 2 days gestation was admitted to Good Samaritan Medical Center labor and delivery for induction of labor due to gestational diabetes. **(A2-7)**

Initiation of labor was started with cytotec per vaginal protocol. **(A5)**

On 9/22/15, around 5:22 a.m., Amy Kogut, CNM ordered the start of Pitocin. **(A8-9)**

2

At 8:04 a.m., Ms. Philemond was on the external fetal monitor. **(A16)** The fetal heart rate (FHR) was 155 with moderate variability and no decelerations. **(A16)** A category 1 tracing was noted. **(A16)**

At 8:30 a.m., an epidural was started for pain management. **(A16)** At around the same time the FHR remained at 155 with moderate variability and no decelerations. **(A16)** A category 1 tracing was noted. **(A12-13, A16)**

At 9:44 a.m., AROM was performed and fluid color was clear. **(A14, A19)**

At 9:45 a.m., the FHR was 160 with variable decelerations including a deceleration to 90 with return to baseline. **(A14, A18-19)** A category 2 tracing was noted and an internal scalp electrode (ISE) was applied. **(A19)**

At 9:46 a.m., a vaginal examination was performed by K. Ballentine CNMS. **(A19)** Ms. Philemond was 6 cm dilated and 100% effaced. **(A19)**

At 10:04 a.m., a deceleration down to 80 was noted with a return to baseline. **(A19)** Marked variability was noted >25 bpm. **(A19)** The FHR was 145 and a category 2 tracing was noted. **(A19)**

At 10:12 a.m., Ms. Philemond was 10 cm dilated. **(A19)** A 6 minute deceleration to the 60's was noted with a return to baseline to the 140's and then terminal bradycardia. **(A15)**

At 10:15 a.m., Ms. Philemond was encouraged to push by Amy Kogut, CNM. **(A15, A19)** An episiotomy was cut and upon delivery of the head a shoulder dystocia was diagnosed. **(A15)** Additional help was called just after delivery. **(A15, A93-94)** CNM Kogut noted that McRoberts, suprapubic and Woods' screw maneuvers were utilized with resolution. **(A15)**

3

At 10:26 a.m. Coligny Rejouis was delivered. **(A94)** APGARS were 1, 3, and 7. **(A93)** At the time of delivery Coligny was noted to have a right arm drop. **(A15, A95)** An x-ray done after delivery reported no fracture. **(A171)** Coligny was diagnosed with a right shoulder dystocia/brachial plexus injury due to traumatic delivery. **(A95-96)** Coligny's right arm remained flaccid after delivery. **(B1)**

To a reasonable degree of medical certainty, Coligny's flaccid right arm is a direct result of unnecessary and excessive force and traction applied by CNM Kogut during delivery.

In October 2015, Coligny was seen and evaluated at Children's Hospital in Boston. **(TAB C)** Upon evaluation Coligny was diagnosed with a severe right brachial plexus injury equal to evulsion due to a difficult birth. **(C1-2)** Due to the severity of the injury neurosurgical intervention was recommended. **(C1-2)**

In February 2016, Coligny underwent brachial plexus reconstruction in an attempt to treat his right brachial plexus injury. **(C4, C9)**

As of April 2016, Coligny has had no recovery of function despite surgical intervention. **(C14)** Coligny's right arm remains flaccid as a result of right brachial plexus birth palsy. **(C14)**

## LIABILITY OF DEFENDANTS

Medical expert, Alexander Friedman, M.D. was consulted regarding the care and treatment rendered to Coligny Rejouis by the defendants. Dr. Friedman is a physician licensed to practice medicine in the state of New York. He is Board Certified in obstetrics and gynecology. He is an assistant professor of obstetrics and gynecology at Columbia University in New York, NY. In addition to this, Dr. Friedman is an attending obstetrician at New York Presbyterian Hospital in New York, NY. He is familiar with the accepted standard of care as it pertains to the average

4

qualified nurse midwife practicing in Massachusetts from 2015 through the present.    Dr. Friedman's curriculum vitae is attached hereto as **Tab D**.

Dr. Friedman is expected to testify that shoulder dystocia refers to a birth where the shoulder of the baby is stuck behind the mother's pubic bone following delivery of the head. Signs of shoulder dystocia occur when the head has been delivered but then retracts against the perineum and anterior delivery of the shoulder is not possible. Gestational diabetes increases the risk of shoulder dystocia. Shoulder dystocia can be reduced using multiple maneuvers; including McRoberts, suprapubic pressure, Rubin, Woods' screw, and delivery of the posterior arm. If none of these maneuvers is successful, fracture of the clavicle can be performed to expedite delivery. Neonatal complications resulting from improperly managed shoulder dystocia include brachial plexus injury (Erb's palsy). When there is use of unnecessary and excessive downward traction in an attempt to relieve a shoulder dystocia, and when all maneuvers to relieve shoulder dystocia are not utilized; there is a significantly increased risk for suffering a severe and permanent brachial plexus injury/Erb's palsy. When Erb's palsy occurs in the setting of a shoulder dystocia, more likely than not, it is due to the application of excessive and unnecessary traction and force during the delivery, as in Coligny's case.

Dr. Friedman is expected to testify that when a shoulder dystocia is encountered during a vaginal delivery, the accepted standard of care in Massachusetts from 2015 through the present requires the average qualified certified nurse midwife to: 1) perform multiple maneuvers, including McRoberts, suprapubic pressure, Rubin, delivery of the posterior arm, Woods' screw, and if none of these maneuvers are successful, fracture of the clavicle; and 2) refrain from applying excessive downward lateral traction. It is not acceptable practice to apply unnecessary and excessive downward traction to facilitate a difficult delivery.

## LIABILITY OF DEFENDANT,
## AMY KOGUT, CNM

In the plaintiff's expert's professional opinion, to a reasonable degree of medical certainty, the care and treatment rendered to Coligny Rejouis by Amy Kogut, CNM on 9/22/15 fell below the accepted standard of care for the average qualified certified nurse midwife when CNM Kogut failed to perform a full repertoire of maneuvers, including Rubin, delivery of the posterior arm, and fracture of the clavicle; and instead, applied excessive and unnecessary force and downward traction when delivering Coligny.

As a direct result of CNM Kogut's deviations from the accepted standard of care, Coligny suffered a severe brachial plexus injury/Erb's palsy that resulted in the permanent loss of use of his right arm. Had CNM Kogut rendered care in accordance with the accepted standard of care, as outlined above, CNM Kogut would have utilized additional maneuvers to safely relieve the shoulder dystocia and, more likely than not, Coligny would not suffer from the severe and permanent brachial plexus palsy (loss of use of his right arm) with which he lives today.

## LIABILITY OF DEFENDANT,
## GOOD SAMARITAN MEDICAL CENTER

The plaintiff alleges that defendant, Good Samaritan Medical Center, through its agents, servants, and employees, is vicariously liable in this matter. The defendant, Amy Kogut, CNM, was employed and associated with Good Samaritan Medical Center at the time of the negligence. **(Tab A)** As such, the plaintiffs allege that Good Samaritan Medical Center is vicariously liable for the negligence of CNM Kogut.

Determination of this matter of vicarious liability is beyond the scope of authorized inquiry of the Medical Malpractice Tribunal, DiGiovanni v. Latimer, 390 Mass. 265, 454 N.E.2d 483 (1983); Flagg v. Scott, 9 Mass. App. Ct. 811, 397 N.E.2d 1300, 1301 (1980). In other

words, the Medical Malpractice Tribunal should only evaluate the medical aspects of the malpractice claim because the question whether the defendant, Good Samaritan Medical Center is vicariously liable is beyond the legislatively granted purview of the Medical Malpractice Tribunal.

## ARGUMENT

Massachusetts General Laws, Chapter 231, §60B, explicitly sets forth both the scope and the limits of this tribunal's function in reviewing a claim of medical malpractice. In the first paragraph of §60B, the tribunal is instructed to review the plaintiff's Offer of Proof to "[D]etermine if the evidence presented, if properly substantiated, is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiffs' case is merely an unfortunate medical result."

If the plaintiff's Offer of Proof is sufficient to raise a legitimate question of liability, the plaintiff can proceed further without a bond. If not, the plaintiff may pursue their claim only by posting a bond of Six Thousand ($6,000.00) Dollars.

The Supreme Judicial Court held in Little v. Rosenthal, 382 N.E.2d 1037, 1041 (1978), that in evaluating evidence submitted by plaintiff in a medical malpractice claim, "the tribunal's task should be compared . . . to a trial judge's function in ruling on a defendant's motion for a directed verdict." Under this standard, a finding for the defendants in a medical malpractice case should be entered "only where, construing the evidence most favorable to the [plaintiff], it is still insufficient to support a verdict in his favor." DeMarzo v. S. & P. Realty Corp., 306 N.E.2d 432, 435 (1974) (quoting Deleo v. Jefferson, 118 N.E.2d 875 (1954); Kelly v. Railway Exp. Agency, Inc., 52 N.E.2d 411 (1943)). For the purpose of such a motion, all evidence favorable to the plaintiff must be accepted as being true.

7

The plaintiff's evidence before this tribunal clearly would not entitle the defendants to a directed verdict. The plaintiffs' Offer of Proof consists of the following documents:

A.  Good Samaritan Medical Center records, dated 9/21/15 through 9/24/15;

B.  Brockton Neighborhood Health Center records, dated 9/28/15 through 10/2/15;

C.  Boston Children's Hospital records, dated 10/12/15 through 4/11/16;

D.  Expert Letter and Curriculum Vitae of Alexander Friedman, M.D.

Certainly, if a jury were to accept the testimony of the plaintiff's expert as true, as the tribunal must for the purpose of this hearing, it would be warranted in returning a verdict for the plaintiffs.

In order to establish liability in a medical malpractice case, the plaintiff must present evidence to establish: (1) the breach of duty owed by the defendant; and (2) a causal relationship between that breach and the damages allegedly suffered. Civitarese v. Gorney, 358 Mass. 652 (1971); Bernard v. Menicks, 340 Mass. 296 (1960). The plaintiffs' Offer of Proof, including the expert report of Alexander Friedman, M.D. clearly satisfies both of these requirements.

In treating the plaintiff, the standard of care required of the individual defendant is to:

exercise the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession. Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

The plaintiffs' expert report states that the standard of care due to Coligny Rejouis was not met by the defendant, Amy Kogut, CNM. The plaintiff's expert opines that as a direct result of CNM Kogut's deviations from the accepted standard of care, as outlined above, Coligny Rejouis suffered a severe brachial plexus injury/Erb's palsy that resulted in the permanent loss of use of his right arm.

## CONCLUSION

The standard, which this tribunal is bound to follow, requires that all rational inferences be resolved in the plaintiff's favor and that this tribunal accept as true all evidence favorable to the plaintiff. Under this standard, "the defendant, in fact, is taken to have conceded the truth" of the plaintiff's evidence. See, *Smith & Zobel, Rules Practice, 8 Mass. Prac., Series, p. 203*. Based upon the Offer of Proof submitted by the plaintiffs and in light of the foregoing standards, the plaintiffs respectfully submit that there is a legitimate question of liability presented and that the plaintiffs should be allowed to proceed further without the imposition of a statutory bond.

Respectfully submitted,
The plaintiffs,
By their attorneys,

Andrew C. Meyer, Jr. (BBO# 344300)
Adam R. Satin (BBO# 663069)
LUBIN & MEYER, P.C.
100 City Hall Plaza
Boston, Massachusetts 02108
(617) 720-4447

9

EXHIBIT D

Alexander Friedman, M.D.
200 East 94th Street, Apartment 623
New York, NY 10128

September 16, 2016

Andrew C. Meyer, Jr.
Lubin & Meyer, P.C.
100 City Hall Plaza
Boston, MA 02108

**RE: Coligny Rejouis**

Dear Mr. Meyer:

I am a physician licensed to practice medicine in the state of New York. I am Board Certified in obstetrics and gynecology. I am an assistant professor of obstetrics and gynecology at Columbia University in New York, NY. In addition to this, I am an attending obstetrician at New York Presbyterian Hospital in New York, NY. I am familiar with the accepted standard of care as it pertains to the average qualified nurse midwife practicing in Massachusetts from 2015 through the present. I have attached my curriculum vitae.

At your request, I have reviewed the pertinent medical records of Marsha Philemond and Coligny Rejouis, including Good Samaritan Hospital records including the fetal heart monitor tracings dated 9/21/15 through 9/24/15, Brockton Neighborhood Health Center records dated 9/28/15 through 10/2/15, and Children's Hospital records dated 10/12/15 through 4/11/16. I understand that Massachusetts law requires an expert review of materials at the initiation of a claim. Therefore, I have reviewed the materials made available to me and have formed the opinions as set forth in this letter. I remain willing to review further medical records and depositions as they become available. I reserve the right to further amend and/or modify this report upon review of any further discovery in this matter.

Coligny Rejouis is an 11 month old baby boy who suffered a right brachial plexus injury (Erb's palsy) due to a traumatic birth that resulted in a flaccid right arm. As of April 2016, Coligny has had no return of nerve function or use of the right arm. In my professional opinion Coligny's severe and permanent right arm injury is a direct result of the substandard care and treatment rendered to him by Amy Kogut, CNM.

In September 2015, Marsha Philemond, Coligny's mother, was a 33 year old G2, P1, expecting the birth of her second child with an EDC of 9/26/15. Ms. Philemond was GBS positive and her pregnancy was complicated by gestational diabetes which was diet controlled.

On 9/21/15, Ms. Philemond at 39 weeks 2 days gestation was admitted to Good Samaritan Medical Center labor and delivery for induction of labor due to gestational diabetes.

Initiation of labor was started with cytotec per vaginal protocol.

1

On 9/22/15, around 5:22 a.m., Amy Kogut, CNM ordered the start of Pitocin.

At 8:04 a.m., Ms. Philemond was on the external fetal monitor. The fetal heart rate (FHR) was 155 with moderate variability and no decelerations. A category 1 tracing was noted.

At 8:30 a.m., an epidural was started for pain management. At around the same time the FHR remained at 155 with moderate variability and no decelerations. A category 1 tracing was noted.

At 9:44 a.m., AROM was performed and fluid color was clear.

At 9:45 a.m., the FHR was 160 with variable decelerations including a deceleration to 90 with return to baseline. A category 2 tracing was noted and an internal scalp electrode (ISE) was applied.

At 9:46 a.m., a vaginal examination was performed by K. Ballentine CNMS. Ms. Philemond was 6 cm dilated and 100% effaced.

At 10:04 a.m., a deceleration down to 80 was noted with a return to baseline. Marked variability was noted >25 bpm. The FHR was 145 and a category 2 tracing was noted.

At 10:12 a.m., Ms. Philemond was 10 cm dilated. A 6 minute deceleration to the 60's was noted with a return to baseline to the 140's and then terminal bradycardia.

At 10:15 a.m., Ms. Philemond was encouraged to push by Amy Kogut, CNM. An episiotomy was cut and upon delivery of the head a shoulder dystocia was diagnosed. Additional help was called just after delivery. CNM Kogut noted that McRoberts, suprapubic and Woods' screw maneuvers were utilized with resolution.

At 10:26 a.m. Coligny Rejouis was delivered. APGARS were 1, 3, and 7. At the time of delivery Coligny was noted to have a right arm drop. An x-ray done after delivery reported no fracture. Coligny was diagnosed with a right shoulder dystocia/brachial plexus injury due to traumatic delivery. Coligny's right arm remained flaccid after delivery.

In my professional opinion, I believe Coligny's flaccid right arm is a direct result of unnecessary and excessive force and traction applied by CNM Kogut during delivery.

In October 2015, Coligny was seen and evaluated at Children's Hospital in Boston. Upon evaluation Coligny was diagnosed with a severe right brachial plexus injury equal to evulsion due to a difficult birth. Due to the severity of the injury neurosurgical intervention was recommended.

In February 2016, Coligny underwent brachial plexus reconstruction in an attempt to treat his right brachial plexus injury.

As of April 2016, Coligny has had no recovery of function despite surgical intervention. Coligny's right arm remains flaccid as a result of right brachial plexus birth palsy.

2

**DISCUSSION:**

Shoulder dystocia refers to a birth where the shoulder of the baby is stuck behind the mother's pubic bone following delivery of the head. Signs of shoulder dystocia occur when the head has been delivered but then retracts against the perineum and anterior delivery of the shoulder is not possible. Gestational diabetes increases the risk of shoulder dystocia. Shoulder dystocia can be reduced using multiple maneuvers; including McRoberts, suprapubic pressure, Rubin, Woods' screw, and delivery of the posterior arm. If none of these maneuvers is successful, fracture of the clavicle can be performed to expedite delivery. Neonatal complications resulting from improperly managed shoulder dystocia include brachial plexus injury (Erb's palsy). When there is use of unnecessary and excessive downward traction in an attempt to relieve a shoulder dystocia, and when all maneuvers to relieve shoulder dystocia are not utilized; there is a significantly increased risk for suffering a severe and permanent brachial plexus injury/Erb's palsy. When Erb's palsy occurs in the setting of a shoulder dystocia, more likely than not, it is due to the application of excessive and unnecessary traction and force during the delivery, as in Coligny's case.

When a shoulder dystocia is encountered during a vaginal delivery, the accepted standard of care in Massachusetts from 2015 through the present requires the average qualified certified nurse midwife to: 1) perform multiple maneuvers, including McRoberts, suprapubic pressure, Rubin, delivery of the posterior arm, Woods' screw, and if none of these maneuvers are successful, fracture of the clavicle; and 2) refrain from applying excessive downward lateral traction. It is not acceptable practice to apply unnecessary and excessive downward traction to facilitate a difficult delivery.

In my professional opinion, to a reasonable degree of medical certainty, the care and treatment rendered to Coligny Rejouis by Amy Kogut, CNM on 9/22/15 fell below the accepted standard of care for the average qualified certified nurse midwife when CNM Kogut failed to perform a full repertoire of maneuvers, including Rubin, delivery of the posterior arm, and fracture of the clavicle; and instead, applied excessive and unnecessary force and downward traction when delivering Coligny.

As a direct result of CNM Kogut's deviations from the accepted standard of care, Coligny suffered a severe brachial plexus injury/Erb's palsy that resulted in the permanent loss of use of his right arm. Had CNM Kogut rendered care in accordance with the accepted standard of care, as outlined above, CNM Kogut would have utilized additional maneuvers to safely relieve the shoulder dystocia and, more likely than not, Coligny would not suffer from the severe and permanent brachial plexus palsy (loss of use of his right arm) with which he lives today.

In conclusion, the care and treatment rendered to Coligny Rejouis by Amy Kogut, CNM on 9/22/15 fell below the accepted standard of care for the average qualified certified nurse midwife, resulting in Coligny's severe and permanent brachial plexus injury.

Sincerely,

Alexander Friedman, M.D.

3